THE LAW OFFICES OF JOHN BURTON
John Burton, SBN 86029
David W. Hiller, SBN 275438
4 East Holly Street, Suite 201
Pasadena, California  91103
Tel. (626) 449-8300; Fax (626) 449-4417
Email: jb@johnburtonlaw.com

Attorneys for Plaintiff Allen B. Shay

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLEN BERNARD SHAY,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, DEPUTY CHRISTOPHER DERRY, and DOES 1-10,<br><br>Defendants. | Case No. CV-15-4607 CAS (RAOx)<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS**<br><br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION AND VENUE

1.      This case arises under 42 U.S.C. § 1983. Accordingly, subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343. Plaintiff's state-law claims arise out of a common nucleus of operative fact and are within the supplemental jurisdiction of the Court.

2.      Plaintiff's claims arise out of a course of conduct involving officials of the Los Angeles County Sheriff's Department in the County of Los Angeles, State of California, and within this judicial district.

**PARTIES**

3.      Plaintiff Allen Bernard Shay is an adult qualified to bring suit on his own behalf. He is licensed by the State of California as a real estate broker. He is black.

4.      Defendant County of Los Angeles is a political subdivision of the State of California, and in doing the acts alleged herein was acting as such, rather than as an "arm of the state" for Eleventh-Amendment immunity purposes. Defendant Los Angeles County Sheriffs Department ("LASD") is an independent entity subject to suit.

5.      Defendant Christopher Derry is a deputy with the Los Angeles County Sheriff's Department, was involved with the investigation, arrest and imprisonment of Plaintiff, and acted under color of law and within the scope of his agency and employment. He is white.

6.      Does 1 to 10 are unnamed because their identities have yet to be ascertained.

7.      Each individually named defendant and each Doe defendant acted under color of law and within the scope of his or her agency and employment.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

8.      Plaintiff timely filed the appropriate administrative claims, which have been denied. This lawsuit is timely.

**FACTS**

9.      Plaintiff Shay was 55 years old on the date of the arrest underlying this lawsuit. Mr. Shay is from a large, well known and respected family in the Pasadena-Altadena community. Mr. Shay graduated from the local high school, John Muir, where he played football, and then graduated from the University of Southern California with a bachelor's degree. Mr. Shay is a licensed real estate broker and holder of a juris doctor degree from the University of West Los Angeles. Mr. Shay is active and well known in his community. He has run for Pasadena City Council and Mayor, and has served as a Pasadena City Commissioner. Aside from this arrest, Mr. Shay has no criminal history whatsoever, and has never on any other occasion been handcuffed or incarcerated.

- 2 -

10.     In January 2005, prior to the real estate market collapse and resulting world financial crisis, Mr. Shay represented a buyer named Eddie Turner, who is also black, in the purchase of a million-dollar-plus home located at 2436 North Altadena Drive, Altadena, California. Mr. Shay had no reason to suspect Mr. Turner of any illegal activity in the transaction, as Mr. Turner provided a 20 percent cash down payment and financed the balance of the purchase, $896,000, through a "negative amortization" adjustable-rate first mortgage (ARM) brokered by Jeffrey Gleason, who is white, from Countrywide Home Loans. Mr. Shay had nothing to do with the loan transaction, or with the reckless use of ARMs and other exotic loan structures by Countrywide. Without the knowledge of Mr. Shay, however, Mr. Turner may have submitted falsified documents with his 2005 loan applications to Countrywide to overstate his income and his assets. Countrywide, following its irresponsible business practices of the time, did not verify Mr. Turner's assets and employment.

11.     Eight months later, Gleason and Countrywide gave Mr. Turner a $250,000 credit line secured by a second mortgage. This loan consumed all the equity in the property. Mr. Shay had no knowledge that this transaction occurred. Mr. Turner may have submitted with his loan application the same or similar falsified documents to overstate his income and his assets, and again Countrywide did not verify the data.

12.     In early 2007, Mr. Turner and Mr. Gleason arranged to refinance the two 2005 loans through Countrywide. In mid-February Mr. Shay facilitated the opening of an escrow account for the transaction at Mara Escrow in Pasadena. Mr. Shay thought that the transaction did not go forward. About a month later, however, and again without the knowledge of Mr. Shay, Mr. Turner may have submitted falsified documents in connection with his refinance loan applications to overstate his income and his assets. Some of those documents may have been sent or received through a fax machine at Mr. Shay's office, and therefore bore that number. Neither Mr. Shay's opening of the Mara Escrow nor the use of Mr. Shay's fax machine suggested that Mr. Shay knew about Mr. Turner's submission of falsified documents.

13.    In late March 2007, Countrywide required Mr. Turner to pay $29,916.43 into Mara Escrow to close the refinance deal. That money and the $1,218,000 loan proceeds were paid to Countrywide to retire the two 2005 loans and to pay points, commissions, and other fees. Mr. Turner received a refund of only $1,616.00 from the escrow, making his net payment to the transaction over $28,000. Mr. Turner's motive for entering into such a transaction is not known to Plaintiff. What is clear, however, is that Countrywide effectively loaned Mr. Turner more than 100 percent of the fair market value of the Altadena Drive property to pay off Countrywide's own loans on the property in a real estate market already showing signs of contraction.

14.    On March 30, 2007, Mr. Shay provided a short-term loan to Mr. Turner in the amount of $29,916.43. At Mr. Turner's request, Mr. Shay purchased a cashier's check payable to Mara Escrow, and showing Mr. Turner as the remitter.  Mr. Turner deposited the check into Mara Escrow to complete the refinancing transaction.

15.    At that time, Mr. Turner was an active real estate speculator and had several transactions in process. Mr. Shay did not know the purpose of the $29,916.43 loan. Mr. Shay secured the loan with money due to Mr. Turner from escrows arising from other transactions. Mr. Turner repaid the loan timely, with modest interest.

16.    After the financial collapse of 2008, caused in large part by loans such as those Countrywide made to Mr. Turner, Bank of America purchased Countrywide and became the holder of the mortgages on Mr. Turner's Altadena property.

17.    In March 2012, apparently because Bank of America was pressuring for payment on the 2007 loans, Mr. Turner reported to the LASD that he had not refinanced his home in 2007, and that he was the victim of identity theft. LASD investigators assembled evidence, including a thumb print in a notary's log and a bankruptcy schedule, that seemed to disprove identity theft.

18.    During the ensuing investigation by Deputy Christopher Derry and others in the LASD, the details of the 2005 and 2007 loans transactions, including Mr. Turner's use of falsified documents to inflate his income and assets, came to light.

- 4 -

Deputy Derry learned that Mr. Shay had not signed any loan documents associated with any of the transactions. Deputy Derry had no facts whatsoever to support any inference that Mr. Shay had any connection to or knowledge of Mr. Turner's falsifying financial documents, or that Mr. Shay knew that Mr. Turner's financial documents fortuitously bearing Mr. Shay's office fax header might have been falsified. There was no connection between Mr. Shay's short term loan to Mr. Turner and any alleged criminal activity.

19.     On September 17, 2013, Deputy Derry interviewed Mr. Shay at his Pasadena real estate office. Deputy Derry surreptitiously audio recorded the interview. Mr. Shay was forthcoming and candid, although Mr. Shay did not at that time understand that the short-term loan he made to Mr. Turner six-and-a-half years previously was used for the 2007 refinancing transactions about which Deputy Derry was asking.

20.     Without conducting any follow up interview with Mr. Shay, on May 1, 2014, Deputy Derry filed a sworn statement accusing Mr. Shay of "On or about March 30, 2007, . . . unlawfully tak[ing] money and personal property of a value exceeding Four Hundred Dollars ($400), to wit U.S. CURRENCY, the property of COUNTRYWIDE HOME LOANS and BANK OF AMERICA," and "unlawfully and knowingly procure and offer a false and forged instrument to be filed." Deputy Derry had no facts on which to base these sworn statements.

21.     Also on May 1, 2014, Deputy Derry filed a sworn statement that "after a review of the facts in this matter, I believe that [Mr. Shay] has had access to significant amounts of monies feloniously obtained from theft," and that "these amounts of monies could be used to arrange for the posting of bail in this matter." Deputy Derry had no facts on which to base these sworn statements.

22.     On May 20, 2014, Deputy Derry appeared at Mr. Shay's home with a squad of deputies. Mr. Shay was arrested and handcuffed for the only time in his life. He was treated roughly, even though he full cooperated during the arrest. Because of false accusations made by Deputy Derry in relation to bail money, Mr. Shay, who

- 5 -

1   received none of the proceeds from the supposedly fraudulent Countrywide loans, was

2   precluded from posting bail until after the Superior Court ruled following a hearing on

3   the source of the funds. As a result, Mr. Shay spent 11 days incarcerated, most of the

4   time housed in a gang-dominated dormitory. Mr. Shay incurred significant legal

5   expenses defending himself before the Superior Court finally dismissed the charges for

6   lack of evidence on September 11, 2014.

7        23.    On May 20, Deputy Derry and the LASD issued a false and misleading

8   press release reporting that Mr. Shay was "arrested and charged with *$2.3 million* in

9   mortgage fraud," publishing his unflattering mug shot along side Mr. Turner's. The

10  release falsely stated that "the employment, income and financial information, including

11  a counterfeit bank statement, submitted by Mr. Turner *and Mr. Shay* to obtain the 2007

12  loans were false. Mr. Turner and *Mr. Shay* also *misrepresented the source* of a $29,916 down

13  payment which was deposited into escrow to obtain the loans." (Emphases added).

14  First, the $2.3 million figure is the result of double counting as the second two loans

15  were used to pay off the first two, and the second two loans were secured by a home

16  Countrywide twice deemed adequate to secure more than $1 million in loans. Second,

17  Mr. Shay did not "submit" the documents specified in the release. Those documents

18  were submitted to Countrywide through an escrow by Mr. Turner, who was working

19  with a loan broker, Mr. Gleason. Third, the $29,916 was not a "down payment," as

20  there was no purchase in 2007. There was no "misrepresentation" regarding the source

21  of those funds. In fact, there was no "representation" regarding their source at all.

22  Mr. Turner's "source" for those funds – a secured, short-term loan from Mr. Shay

23  repaid with interest – has nothing to do with any of Mr. Turner's alleged wrongdoing

24  associated with the 2007 transaction.

25       24.    The LASD false and misleading press release was repeated virtually

26  verbatim, with the photos, in the *Pasadena Star News*, the major news outlet for Mr.

27  Shay's business and social community. Mr. Shay could not respond to the reporter's

28  inquiries because he was locked up and being processed into the LASD jail system. The

- 6 -

reporting devastated Mr. Shay personally and professionally. Mr. Shay grew up in the greater Pasadena area, where his large family has managed a popular neighborhood coffee shop for several decades. After graduating from John Muir High School – Jackie Robinson's alma mater – Mr. Shay became the first member of his family with a college degree, graduating from the University of Southern California.

25.     The arrest and prosecution of Allen Shay reveals the significant biases held by the Los Angeles County Sheriff's Department and Deputy Derry. The real criminal enterprise operating here was Countrywide, and the real criminal its CEO Angelo Mozilo, assisted by his legion of morally challenged acolytes. Countrywide's failure to do a rudimentary check on Mr. Turner's initial loan application allowed him to receive a $900,000 "negative amortization" and "adjustable rate" first mortgage, which was most likely packaged into a security and dumped into the world market. At least that loan was protected by a 20 percent equity cushion, but Countrywide, in a mind boggling display of corporate irresponsibility, if not outright criminality, eight months later gave Mr. Turner a $250,000 line of credit on top of his expanding first mortgage, financing the one home to more than 100 percent of its fair market value, without verifying Mr. Turner's ability to service the loan.

26.     By early 2007, when Countrywide's massive Ponzi scheme began coming undone, Countrywide borrowers, including Eddie Turner, were pressured to buy new loans.  The only purpose of the two 2007 loans, in which Mr. Shay had only minor tangential involvement and no financial stake, was to replace Countrywide's earlier two loans, thus padding Countrywide's sales statistics and generating fees and commissions to delay its inevitable collapse.

27.     Mr. Turner was, at most, a bit player whom the big boys left holding the bag while they perpetrated a multi-billion dollar scam that crashed the world economy. Mr. Shay, who is black, was an entirely innocent bystander, and Deputy Derry's decision to prosecute him, rather than Jeff Gleason, a white person, and the loan broker responsible for presenting Mr. Turner's supposedly falsified financial records to

1  Countrywide, and who chose not to perform any independent checks on Mr. Turner's

2  employment or assets on at least three separate loan applications, was far more

3  implicated in any potential criminal conduct than Mr. Shay.

4       28.    Regardless, if anyone deserved to be in the defendant's chair, it would be

5  Angelo Mozilo, who netted a half-billion dollars from Countrywide with practices such

6  as those underlying this case, paid his way out of criminal prosecution with relatively

7  small civil penalties, and now manages investments from the comfort of his

8  12,692-square-foot house in Santa Barbara, California.

9                                      **DAMAGES**

10      29.    Over the last several decades, Mr. Shay has established himself as a highly

11 reputable, active real-estate broker in the greater Pasadena area. Mr. Shay is politically

12 active, having run for office, and until recently served as a Pasadena Commissioner. He

13 has since run for Mayor, although this incident was raised during his campaign.

14 Mr. Shay's reputation, aside from this incident, is excellent.

15      30.    As a direct and proximate result of the aforesaid acts and omissions, and

16 the customs, practices, policies and decisions of the Defendants alleged in this

17 complaint, Mr. Shay suffered through 11 days wrongful imprisonment, causing him

18 injury in his health and person. He suffered and will continue to suffer great mental and

19 physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation,

20 indignity, embarrassment, harm to reputation, and apprehension, which have caused

21 Plaintiff to sustain damages in a sum to be determined at trial.

22      31.    As a further direct and proximate result of the aforesaid acts, omissions,

23 customs, practices, policies and decisions of the Defendants, Plaintiff suffered past and

24 future losses of income which have caused Plaintiff to sustain damages in a sum to be

25 determined at trial.

26      32.    As a further direct and proximate result of the aforesaid acts, omissions,

27 customs, practices, policies and decisions of the Defendants, Plaintiff incurred legal,

28 medical and other expenses, and will incur future legal, medical and other expenses,

1  which have caused Plaintiff to sustain damages in a sum to be determined at trial.

2  33.    As a further direct and proximate result of the aforesaid acts, omissions,

3  customs, practices, policies, and decisions of the Defendants, Plaintiff suffered

4  inconvenience, lost income and incurred additional expenses in defending himself

5  against criminal charges in a sum to be determined at trial.

6  34.    Plaintiff now has a felony arrest on his criminal history, accessible in

7  seconds, complete with mug shot, just by googling his name.

8  35.    The individually named and Doe defendants, excluding Defendants

9  County of Los Angeles and LASD, acted outside the scope of their jurisdiction and

10  without authorization of law. The aforementioned acts of the Defendants, and each of

11  them, was willful, wanton, malicious and oppressive, with reckless disregard of or

12  deliberate indifference to and with the intent to deprive Plaintiff of his constitutional

13  rights, and did in fact violate the aforementioned rights, entitling Plaintiff to exemplary

14  and punitive damages in an amount to be proven at the trial of this matter.

15  **CLAIMS FOR RELIEF**

16  **FIRST CLAIM FOR RELIEF**

17  **DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. § 1983**

18  **(Fourth and Fourteenth Amendment – Individual Liability)**

19  36.    Deputy Derry and Doe defendants, while acting under color of law,

20  deprived Plaintiff of his civil rights by violating his rights under the Fourth and

21  Fourteenth Amendments by filing a false and misleading warrant for his arrest, as

22  alleged above, by filing an arrest warrant application that failed to provide a substantial

23  basis for a probable cause determination and that was so lacking in probable cause that

24  no reasonable officer could have believed it valid, by arresting him without probable

25  cause, by defaming him in the press release and other public statements based on the

26  false arrest and detention, and by prolonged his incarceration by lying and concealing

27  material facts concerning the source of funds available for bail. Defendants also caused

28  Plaintiff's malicious prosecution, as alleged further in the following paragraphs.

37.     When causing the prosecution of Plaintiff, Deputy Derry and the Doe defendants acted in an intentionally discriminatory manner against Plaintiff based on the fact that he is African American, as is the other person charged and arrested for the allegedly fraudulent loans, Eddie Turner. Jeff Gleason, the white mortgage broker responsible for processing and verifying Mr. Turner's loan applications to Countrywide who, unlike Plaintiff, gained financially from the supposedly fraudulent loan transactions, was not similarly charged and arrested. Deputy Derry treated Mr. Gleason throughout the investigation and prosecution as a victim, and treated Plaintiff, along with his African-American associates, with suspicion and hostility.

38.     Plaintiff does not allege that Mr. Gleason committed a crime, nor that Mr. Gleason should have been charged or arrested. Plaintiff alleges that Defendants should have treated Plaintiff in the same manner as they treated Mr. Gleason, and that Defendants would have done so except that Plaintiff, like Mr. Turner, is African American, and Defendants acted on a racist assumption that because both were black, they were acting in concert to violate criminal statutes. Thus, the prosecution against Plaintiff was initiated by Deputy Derry and Doe defendants with the discriminatory purpose and had the discriminatory effect of depriving Plaintiff of equal protection of the laws, thus depriving Plaintiff of constitutional rights in violation of § 1983.

39.     In addition, Deputy Derry initiated the criminal prosecution of Plaintiff for a malicious purpose and with a lack of probable cause to believe that Plaintiff committed either of the crimes alleged, grand theft and fraudulently recording an instrument, thus depriving Plaintiff of constitutional rights in violation of § 1983.

40.     The above acts and omissions, under color of law, have no justification, are objectively unreasonable, and constitute an abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the course of protecting persons or property, or ensuring civil order.  The above acts and omissions were consciously chosen from among various alternatives.

41.    As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as alleged above, and Deputy Derry and Defendant Does should be assessed punitive damages in accordance with proof.

## SECOND CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
## (Entity Liability)

42.    At all times herein mentioned, Defendants County and the LASD, the Entity Defendants, with subjective and objective deliberate indifference, and in conscious and reckless disregard to the safety, security and constitutional and statutory rights of people within Los Angeles County and otherwise subject to the jurisdiction of the LASD, including the right to be free from unreasonable searches and seizures, the right to bail, and the right to be free from malicious prosecutions based on racial animus or false and misleading reports, failed to train or supervise deputy sheriffs, and instituted policies and allowed constitutional violations as alleged herein.

43.    Among other things, Defendants County and LASD fails to adequately train and supervise deputy sheriffs in the investigation of white-collar crimes such as real-estate fraud. Obtaining first and second mortgages on real property in 2005 and 2007 from predatory lending institutions such as Countrywide, which was then a sophisticated and manipulative player in world financial markets, has nothing in common with bilking seniors out of their savings or stealing identities to kite checks, the sort of low-level white-collar crimes some deputies may be qualified to be trained to investigate.

44.    The County and the LASD were objectively and subjectively deliberately indifferent in that they did not provide the appropriate training or supervision to LASD deputies assigned to investigate sophisticated white-collar real-estate crimes. As a result deputy investigators such as Deputy Derry did not know how to differentiate between lawful and unlawful conduct by licenced real estate professionals such as Plaintiff.

45.     The Entity Defendants, for example, did not insure that deputies understood the fundamentals of the transactions they investigated, including the fiduciary responsibility of financial institutions such as Countrywide to exercise due diligence when making loans, rather than rubber-stamping loan applications to sell as many loans as possible, regardless of the sufficiency of the real estate to secure the transaction or chances that the borrower could actually repay the loan. The Entity Defendants turned a blind eye to violations of the law by Countrywide and its top managers, who had a practice of irresponsibly packaging shaky, unverified and unreasonable loans into fraudulent securities that were sold on the international financial markets, almost destroying the world economy in 2008. The Entity Defendants had policies, practices and customs of targeting small fish rather than the real criminals such as Countrywide itself and its CEO Angelo Mozilo.

46.     Citing examples relevant to this case, LASD deputies are not trained to distinguish first mortgages, which generally requires down payments, from refinancing transactions, which do not. They are not trained that money loaned to a real estate purchaser is not actually pocketed by the purchaser, but is used to pay the seller for the real estate that, in tun secures the loan. Deputies are not trained that refinancing a transaction does not result in a second payment of money free and clear to the borrower, but that most or all of the money from the second loan is used to pay off the first loan. They are not trained that charging someone with recording a false or forged instrument requires probable cause that the person knowingly recorded a false or forged instrument.

47.     Deputies are allowed to initiate prosecutions and make arrests for real estate fraud without being trained on the elements for charges relating to grand theft through real estate fraud or the recording of false or forged instruments. They are not properly supervised in conducting such investigations.  LASD officers assigned to investigate real estate fraud are given far less training than is required of applicants for a California real estate agent's license.

48.     Defendants County and LASD's deliberate indifference to training and supervision for the investigation of financial crime perpetrated through real estate transactions encourages deputies to rely on racial profiling and stereotyping rather than evidence in the conduct of investigations, and shows a deliberate indifference on behalf of the County and LASD to the rights of persons such as Plaintiff with whom deputies come into contact.

49.     The Entity Defendants have a policy, practice and custom of allowing deputy sheriffs to fill out a boilerplate "Declaration in Support of Ex Parte Motion to Examine Source of Bail" pursuant to Cal. Penal Code § 1275, and to state falsely on the court record, without any factual support, that a person being arrested "has had access to significant amounts of monies feloniously obtained from theft," and "that these amounts of monies could be used to arrange for the posting of bail in this matter." Such fabrications, encouraged by the County through its prosecuting attorneys, result in the denial of the constitutional right to bail and otherwise cause the wrongful pretrial confinement of criminal defendants who would otherwise have been released.

50.     As a direct and proximate result of the foregoing, Plaintiff sustained injury and damages as alleged above. Plaintiff does not seek punitive damages under this claim for relief because the entity defendants are immune.

## THIRD CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS -- CALIFORNIA CIVIL
## CODE §§ 52 AND 52.1

51.     The County of Los Angeles, LASD, Deputy Derry, and the Doe defendants are each subject to liability under California Civil Code §§ 52 and 52.1 because Deputy Derry and the Doe defendants intentionally interfered with, and attempted to interfere with, Plaintiff's federal and state constitutional and statutory rights by threats, intimidation or coercion.

52.     Defendants arrested and charged Mr. Shay, who was less involved in the subject loan transactions than Mr. Gleason, because Mr. Shay, like Mr. Turner, is

African American, and Mr. Gleason is white. Deputy Derry harbors racial prejudice to the extent that he tends to presume black men who associate together are involved in criminal conduct together, but makes no similar presumption regarding men of European origin, such as himself. Based on Deputy Derry's racial animus, and also regardless of that animus, Defendants violated Plaintiff's rights under the federal and state constitutions to be free from unlawful seizure made without probable cause, and his right to bodily integrity as guaranteed by California Civil Code § 43.  Defendants violated, and attempted to violate, each of these right by, threats, coercion and intimidation, including imprisoning Plaintiff for 11 days without bail based on Deputy Derry's maliciously false statements regarding Plaintiff's resources to post bail.

53.     The above acts and omissions had no justification or excuse in law, and instead constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the course of protecting persons or property, or ensuring civil order.

54.     As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as alleged above, and is entitled to actual and statutory damages.

55.     Deputy Derry and Defendant Does should be assessed punitive damages in accordance with proof.

## FOURTH CLAIM FOR RELIEF
## FALSE IMPRISONMENT

56.     Deputy Derry and Doe defendants, acting in the course and scope of their employment, falsely arrested and imprisoned Plaintiff by obtaining an arrest warrant based on false information, unsupported by probable cause, and arresting Plaintiff without probable cause on or about May 20, 2014, and then intentionally prolonging Plaintiff's time in custody for 11 days by filing an affidavit with statements that Deputy Derry and Doe defendants knew to be false.

57.     As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as proved.  In doing these acts, Detective Derry and Doe defendants acted with malice, oppression, and fraud, justifying an award of exemplary and punitive damages.

## PRAYER

WHEREFORE, Plaintiff requests relief as follows, and according to proof, against each defendant:

1.     General and compensatory damages in an amount according to proof;

2.     Special damages in an amount according to proof;

3.     Exemplary and punitive damages against each individual and Doe defendant, not against the County of Los Angeles or LASD, in an amount according to proof;

4.     Costs of suit, including attorneys' fees, under the relevant provisions of state and federal law; and,

5.     Such other relief as may be warranted or as is just and proper.

Dated:  November 4, 2015       THE LAW OFFICES OF JOHN BURTON


By:   _____/s/John Burton_____
                John Burton
                Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

Dated:  November 4, 2015       THE LAW OFFICES OF JOHN BURTON


By:   _____/s/ John Burton_____
                John Burton
                Attorneys for Plaintiff

- 15 -